BYRNES, Judge,
dissenting with reasons.
I respectfully dissent. On November 19, 1982, Mr. Harvey repurchased from Dixie Graphics all of the stock of Harvey Press, Inc. Three days later in a related transaction Mr. Harvey sold the stock to Rebsamen Industries Inc. Mr. Harvey previously owned the stock and had sold it to Dixie Graphics in 1981. Because of financial problems, Mr. Harvey had difficulty receiving all payments due him in connection with the sale. He was, therefore, placed back in substantial control of the business for several months pending the repurchase. He employed his own firm of accountants to examine the books and records of Harvey Press before the repurchase. This process is known in the field of commercial transactions as due diligence. His accounting firm determined the scope of the audit. No request the auditors made for information was refused.
Subsequent to Mr. Harvey’s repurchase of Harvey Press and resale to Rebsamen Industries the I.R.S. disallowed a large portion of the bad debt deductions taken by Harvey Press for the tax year ending October 31, 1981. Based upon the unqualified warranties in his sale to Rebsamen, Mr. Harvey was required to pay this tax liability of $91,542.00 in taxes and $85,681.98 in interest. The trial court ordered these sums plus $31,000.00 for professional fees be paid by Dixie to Mr. Harvey pursuant to the trial court’s finding that Dixie had actual knowledge of the tax liability at the time it sold Harvey Press to Mr. Harvey which was a violation of warranties contained in the sales contract.
I. SELLER’S REPRESENTATIONS AND WARRANTIES[1]
The stock purchase agreement contains the following language in Section “3” relevant to the warranty issue:
*124 The Seller represents and warrants to the Purchaser as follows:
* * * # * ⅛
D. Absence of Undisclosed Liabilities; Financial Statements. As of the Balance Sheet date, July SI, 1982, the Seller has no actual knowledge of any undisclosed lia *125 bilities of any nature, whether accrued, absolute, contingent or otherwise, against the Company which are not disclosed on the financial statements and which exceed $10,000 in the aggregate including, without implied limitation, all Federal, State, County and municipal tax liabilities due or to become due. The audited balance sheet of the Company as of July 31, 1982 and related statements, prepared by Main Hurdman have been previously identified and have been delivered or will be delivered to Purchaser and, to the best of Seller’s knowledge, have been prepared in accordance with generally accepted accounting principles applied on a consistent basis, correctly set forth the financial condition of the Company at the date of said balance sheet, and do not omit to state any material liability (contingent or otherwise) or other fact necessary to be set forth therein to make such balance sheet and income statements not misleading, and are- attached hereto as Exhibit A. (Emphasis added).
E. Tax Returns. The Company’s tax returns have been filed as required by law, and all taxes shown thereon have been paid when due.
* * * ⅜ ⅜ *
Q. No Duty of Investigation. All of the foregoing warranties made by the Seller that relate to the knowledge of the Seller are made without specific investigation of the circumstances relating to such warranties, and the reference in such warranties to the knowledge of the Seller shall not be deemed to impose a duty upon the Seller to undertake such an investigation.
When these sections are read together it is clear that Dixie Graphics does not provide any warranties for undisclosed liabilities, contingent or otherwise of which Dixie had no actual knowledge. This specifically includes tax liabilities such as the one that is the subject of this suit. The term “actual knowledge” must be understood as it is normally understood. We note that on both sides of the transaction in the instant ease were sophisticated businessmen, accountants and attorneys.
There is no reason to believe that the purchaser did not know, or should have known the significance of the warranty limitations. There is overwhelming proof in the record that the parties specifically adverted to the significance of the phrase “no actual knowledge.” The same sentence in an earlier draft of the agreement was identical except that it lacked the phrase “no actual knowledge.” The subsequent insertion of that phrase in the final document had to be deliberate. This is reinforced by reference to the corresponding paragraph in the agreement whereby Theo Harvey turned around and resold Harvey Press to Rebsamen Industries, Inc. in a similar transaction three days later which does not contain the “no actual knowledge” limitation. The two documents are so close in form and language that it is obvious that they are closely related. The correlation between the two agreements is best demonstrated by reference to the section in both agreements entitled “Closing and Effective Date” which commences with the following sentence identical to both:
“Subject to the fulfillment of all conditions and prerequisites set forth herein, the Closing shall take place in New Orleans, Louisiana, on the 19th day of November, 1982, or on such other date as may be mutually agreed upon between the parties.”
Although there was a three day delay between the closing of the sale by Harvey to Rebsamen, the true propinquity of the agreements is proved by the above quoted language showing that it was the original intention of the parties that the two agreements be executed on the same day. Such differences as exist in the language of the two documents had to be deliberate and intentional. Therefore, we find that given the facts of this case the language of the agreement whereby Mr. Harvey purchased from Dixie is clear and specific enough to waive the warranty for undisclosed liabilities, including taxes, where the seller had no actual knowledge.
The second sentence of Section 3.D dealing with the July 31, 1982 financial statement prepared by Main Hurdman is also subject to the requirement of “actual knowledge” for two reasons:
*126 1. In the earlier draft of the sale by Dixie to Harvey and in the Rebsamen agreement this sentence is in a separate paragraph preceding the paragraph concerning undisclosed liabilities. The deliberate transfer of this provision in the final draft of the agreement between Dixie and Harvey to a position in the same paragraph with and immediately following the “no actual knowledge” limitation constitutes a clear intention that the representation concerning the financial statement be subject to that limitation.
2. The paragraph as a whole makes no sense unless the second sentence is subject to the limitation of the first sentence that, “as of the Balance Sheet date, July 31, 1982, the Seller has no actual knowledge of any undisclosed liabilities....” If the seller is bound regardless of knowledge in the second sentence to a warranty that “the audited balance sheet of the Company as of July 31,1982 and related statements ... do not omit to state any material liability (contingent or otherwise) ...” it would nullify the “no actual knowledge of undisclosed liabilities” warranty limitation contained in the immediately preceding sentence. We are not permitted to adopt such a self-contradictory and inconsistent interpretation. LSA-C.C. art. 2049.
If actual knowledge meant constructive knowledge, Section 3.Q. “No Duty of Investigation” would be meaningless. Section Q is not surplus boiler plate. It was not included in the draft of the sale by Dixie to Harvey nor the sale by Harvey to Rebsamen.[2] It is no coincidence that it was inserted in the final draft of the sale by Dixie to Harvey along with the actual knowledge language. We cannot ignore it. We are required to give it effect. LSA-C.C. art. 2049.
By specifically relieving Dixie of the duty to investigate, Section 3.Q. reinforces the fact that Dixie will not be held to a “could have known” or “should have known” standard. Constructive knowledge is not actual knowledge for purposes of this agreement. Mr. Harvey does not contest this point. He argues only about what constitutes proof of actual knowledge and about which provisions in the agreement the actual knowledge requirement is applicable. The only standard by which Dixie may be held accountable besides actual knowledge is that of good faith which is implicit by law in all Louisiana contracts. As applied to the issue of knowledge it would mean that Dixie would be in bad faith if it refused to look at information offered to it in a deliberate attempt to avoid responsibility for such knowledge by adopting a “Don’t tell me, I don’t want to know” stance. There is no suggestion of such deliberate, calculated ignorance on Dixie’s part.
II. TAX RETURNS
Section 3.E. of the agreement provides that:
The Company’s tax returns have been filed as required by law, and all taxes shown thereon have been paid when due.
This means that all required tax returns have been filed in good faith; that they are complete and regular on their face; and that all taxes as shown on the returns have been paid. It is not a warranty against the possibility of a future audit and recalculation of the taxes due.
Mr. Harvey’s contention that this paragraph provides an absolute warranty against future review by the IRS is inconsistent with the limitation of Dixie’s warranty to only those undisclosed tax liabilities of which it had actual knowledge as set forth in the section 3.D which immediately precedes this provision. The only ambiguities in this contract are those that would be created if we were to adopt Mr. Harvey’s interpretation of the document which is internally inconsistent and contradictory. If we were to adopt Mr. Harvey’s interpretation of Section 3.E. it would render ineffective language in Section 3.D. limiting the warranty to only those tax liabilities of which Dixie had actual knowledge. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one *127 that renders it ineffective. LSA-C.C. art. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. art. 2050.
III. MR. HARVEY FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT DIXIE HAD ACTUAL KNOWLEDGE OF HARVEY PRESS’ TAX LIABILITY
Mr. Harvey has the burden of proving by a preponderance of the evidence that Dixie had “actual knowledge” of the tax liability. Although this does not require an admission by Dixie that it had knowledge, it does require more than a few vague hints and innuendos.
The record contains a $135,189.59 IRS tax bill dated April 26, 1982 for Harvey Press’ tax year ending June 12,1981. A substantial portion of Mr. Harvey’s brief was devoted to arguing that Dixie breached its warranty to him because this tax bill was not resolved until after July 31, 1982, the cut-off date contained in the stock purchase agreement. Whether this bill was satisfied before or after July 31,1982 is irrelevant. The $135,000 tax bill has nothing to do with the IRS’s decision to disallow the bad debt deductions that are the subject of this litigation. It is not sufficient for Mr. Harvey to show a technical violation of the purchase agreement. He must show actual damages. Mr. Harvey has not claimed, nor does the record support a claim for damages in connection with the $135,000 tax bill. In any event the tax bill was satisfied by offset prior to July 31, 1982.
In response to the IRS bill, Rodney Brow-er, who was the accountant at Touche, Ross handling ⅛ Harvey Press’ taxes wrote a letter to the IRS dated April 30, 1982 requesting that the IRS use the $167,383 refund due Harvey Press to offset Harvey Press’ tax liability. After this offset, Harvey Press was due a cash refund of $32,194 plus interest.
On June 10, 1982, Mr. Brower forwarded to the IRS a letter containing an IRS Form 2848 “Power of Attorney and Declaration of Representative” dated June 8, 1982 and three Forms 1139 “Corporation Application for Tentative Refund.”
There is not the slightest hint of controversy in the letter. The letter informs the IRS that Harvey Press, Inc. is a member of the Dixie Graphics Inc. consolidated group.
The only references in the letter implying ongoing interaction between the IRS and Harvey Press were:
1. Notification to the IRS that Harvey Press had received a check [presumably from the IRS] accompanied by no explanation.
2. A reiteration of the Harvey Press’ previous request “that the balance due and the refunds be offset against each other and the remainder plus interest be refunded as soon as possible.”
3. A request for “an accounting of the amounts of the refunds and interest applied to the prior year liability.”
At the end of June, Linda Yates, the IRS’ “Problem Resolution Officer,” notified Mr. Browner that the refund check due Harvey Press had been delivered to an address across the street from Harvey Press. On June 30, 1982, Mr. Brower wrote a letter to the IRS thanking Ms. Yates for her assistance. The IRS then issued another refund check of $31,846.49 prior to July 31, 1982. As this was the approximate amount of Harvey Press’ excess net operating loss carry-back, from Dixie’s perspective the offset had been accomplished, the taxes due satisfied, and all issues resolved.
Although the power of attorney form is broad enough to include other matters, the record does not support Harvey’s contention that it really is proof that there was an unresolved dispute with the IRS.
Nor does the record support Mr. Harvey’s contention that the decision by Dixie to have Harvey Press claim the bad debt deduction was so obviously unjustified as to constitute bad faith or actual knowledge of invalidity.
Mr. Harvey’s brief contends that: “Dixie and its accountants [Touche-Ross] decided well in advance of the end of the consolidated tax year to show a big loss in Harvey Press by hook or by crook since everybody at Touche-Ross and Dixie knew that there was no way the tax due with the June 12, 1981 return would get paid.” [Emphasis added]. *128 This is the very foundation of Mr. Harvey’s case. But a decision to claim a large deduction is not the same as a decision to knowingly claim an invalid deduction. The record does not support Mr. Harvey’s contention that a decision was made to claim a large deduction “by hook or by crook.”
Mr. Harvey asserts that Dixie by failing to join him in the defense of the Harvey Press tax return “waived any right to argue the substantive correctness of Mr. Harvey’s settlement of the IRS audit related to Dixie’s bad debt deduction in this ease” pursuant to section 8.B. of the stock purchase agreement. Section 8.B. does not determine liability; it only determines quantum in the event liability is found. Dixie’s liability is determined “by the terms of the Agreement”, i.e., as limited by the warranty clauses.
Mr. Harvey asserts that Mr. Brower’s testimony concerning the offset of the $135,000 tax bill is not credible. This argument is based upon the premise that if Mr. Brower had really requested an offset, he would have also requested an accounting from the IRS which he would have documented. Mr. Harvey states that no such documentation exists. The letter from Mr. Brower to the IRS of June 10, 1982 clearly requests such an accounting.
The “received” and “allowed” stamps on Harvey Press’ refund request forms denote only procedural compliance and are not conclusive as to the substantive correctness of the deductions which were the catalyst triggering the refund request, but they do provide evidence of Dixie’s good faith and lack of actual knowledge.[3]
Mr. Harvey argues that the gap in documentation of Dixie’s interaction with the IRS from July of 1982 until March of 1983 when the tax audit began is proof that Dixie was hiding something. However, this pattern of evidence is entirely consistent with Dixie’s position that the question of the $135,000 tax bill had been resolved by offset by July of 1982 and that there was no further involvement with the IRS until the audit began in March of 1983.
Mr. Harvey commissioned Main Hurd-mann to do a balance sheet audit of Harvey Press in anticipation of the stock purchase. Albert Richard, III, the audit partner in charge of the Harvey Press audit testified for Mr. Harvey that as part of the audit Dixie furnished a copy of the consolidated tax return “with the other companies blocked [whited] out.”
However, on cross examination Mr. Richard testified that he determined the scope of the audit, and that no attempt was made to restrict his access to documents or information. Mr. Richard did not testify that he found anything irregular, suspicious, improper, unusual, or alarming in this at that time, or later, with the benefit of hindsight. If he had he certainly would have made an issue of it at the time of the audit. He did testify that he was never refused access to any information he requested. If Dixie’s intention had been to hide the numbers that had been whited out from the auditors for improper reasons they would not have chosen such a clumsy method. Entries that are whited scream from the page for your attention. It is the equivalent of erecting a neon sign on top of a buried treasure. Neither Dixie’s actions nor the actions and testimony of Mr. Harvey’s auditor on this point are indicative of “actual knowledge” on Dixie’s part.
Mr. Harvey argues repeatedly that Dixie had “knowledge of the defects contained in the tax returns as a matter of law.” This is nothing more than a restatement of the maxim “ignorantia legis neminem excusat” or “ignorance of the law excuses no one.” The fact that Dixie is presumed by law to know the tax law is not “actual knowledge” as that term is used in the stock purchase agreement. It is most unlikely that anyone has actual knowledge of all that the tax laws and regulations presume we know, and it is an absolute certainty that even legal scholars *129 may disagree in complete good faith as to applicability of tax laws and regulations to a particular set of facts.
A review of the tax laws and regulations at issue along with Dixie’s reasons for believing that the deductions were reasonable and had in fact been allowed reveals nothing that would support a finding of bad faith or actual knowledge.
Mr. Harvey testified that it was his opinion that Dixie had actual knowledge. He gave three reasons:
I. “... [T]he tax returns signed under the law of purjery [sic] and I think any officer that signs a tax return must know what’s in the tax return. So since he signed it on the penalty of purjery [sic], I would think they would have known.”
The signature on the return is not a guarantee under penalty of perjury against unknown good faith errors. Dixie’s position is that if there was an error it was made unknowingly and in good faith. Mr. Harvey’s testimony on this point is of no probative value.
II. Mr. Harvey testified that:
This was in November right after I bought the Company back and then sold it to Rebsamen. I said, Well, Tom [Cole], what is your future at Dixie Graphics and are you happy there?’ ... [Tom Cole] said, Well I’m happy here, but I don’t think I’m going to be here much longer.’ He says, “I don’t want to be here when things blow up. “I said What do you mean?’ He said, Well, I think we’re going to have some severe tax problems.” And, you know, at that time, in retrospect, I know exactly what he was talking about because I knew they filed a consolidated return.
[[Image here]]
The Court:
... He asked you at the end of November [sic], did Mr. Cole tell you anything that made you believe that was a tax problem?
Mr. Harvey:
Oh, no.
By Mr. Tarcza:
Q. And he knew there was a tax problem?
A. Well, he said there was a tax problem, yes. But he didn’t specifically say what it was.
⅜ * * * * *
By Mr. Hamilton:
* * * * * *
Q. Do you remember exactly what Mr. Cole said to you?
A. Oh, I could remember he said that he was probably not going to stay around Dixie too long because he was afraid when things blew up he didn’t want to be. And then he referenced that to a tax problem. He used those words.
Q. He was talking about a Dixie tax problem, wasn’t he?
A. Well, he didn’t indicate whether it was a Dixie problem only or a Harvey Press problem. [Emphasis added]
Q. Right, he didn’t indicate.
A. Well, he didn’t indicate. But he knew there was a lot of things wrong with the taxes. That’s what he told me.
Q. Okay. And he was at that time employed by Dixie and not by Harvey.
A. Yes, he was employed by Dixie, that’s correct.
Q. Do you know whether Mr. Cole was involved in any improper conduct with respect to preparing or filing tax returns of Dixie on Harvey Press? [Emphasis added]
A. No, I wouldn’t say that. No, I don’t think that’s true.
This testimony by Mr. Harvey is of little probative value. It is not a matter of credibility concerning which we should defer to the trier of fact in the absence of manifest error. I accept as true Mr. Harvey’s sincerity in expressing his opinion that Tom Cole knew of Harvey Press’s undisclosed tax liability prior to November 19, 1982. But he offered nothing to support that opinion. Mr. Harvey had no way of knowing what the tax problem was, or even if it was a Harvey Press tax problem. It was all conjecture on *130 his part. Opposed to Mr. Harvey’s unsupported conjecture is the uncontroverted, objective evidence that Mr. Cole did not leave Dixie’s employ contrary to what Mr. Harvey testified he told him. He was still employed by Dixie at the time he testified in this case. If Mr. Harvey’s testimony has any significance, it is his belief that Tom Cole was not involved in any improper conduct.
III. “... [T]he chronology of events that happened when the I.R.S. questioned the return, then Dixie geared up to defend their position” was the remaining reason given by Mr. Harvey to explain why he had formed the opinion that Dixie had actual knowledge. This is not a matter of credibility. Again, I accept as true the sincerity with which Mr. Harvey offered this opinion. However, Mr. Harvey offered nothing to support his opinion.
This was a large commercial transaction. Mr. Harvey was represented by expert accountants and lawyers. It undermines the security of commercial transactions to allow him to repudiate what they negotiated on his behalf. This Court should turn a deaf ear to arguments that he did not understand certain clauses or they were not fully explained to him or called to his attention. It should not be the function of this court to protect sophisticated businessmen from the consequences of their voluntary business decisions entered with the assistance of accountants and lawyers.
Mr. Harvey was required to prove by a preponderance of the evidence that Dixie had actual knowledge of the tax liability. Hints and innuendos are not sufficient. Mr. Harvey failed to sustain his burden of proof.
I would reverse the judgment of the trial court.

. There appear to be no cases applying the rules of quanti minoris and redhibition to the sale of incorporeals such as was involved in the instant case but LSA-C.C. art. 2475 provides that:
"The seller is bound to two principal obligations, that of delivering and that of warranting the thing which he sells.” [Emphasis added]
LSA-C.C. art. 2476 provides that:
"The warranty respecting the seller has two objects: the first is the buyer's peaceable possession of the things sold, and the second is the hidden defects of the thing sold or its redhibitory vices.” [Emphasis added]
The language of these articles appear to apply to all sales generally. Their position at the beginning of that chapter of the Civil Code entitled *124 "Chapter 6 — Of The Obligations Of The Seller" implies general applicability. Placed as they are at the outset of this chapter prior to the numbered and titled sections within the chapter, it appears that they were intended for general application throughout the chapter.
Sales include incorporeals such as the stock in Harvey Press. LSA-C.C. art. 2449.
Therefore, one could conceivably infer from the structure of "Title VII-OF Sale" of the Civil Code that LSA-C.C. arts. 2520-2548 dealing with the redhibitory action and quanti minoris apply to the sale of incorporeals such as the stock in Harvey Press that Dixie sold to Harvey. Consequently the tax liability of Harvey Press which was unknown to Mr. Harvey when he bought the company was a latent defect or vice as defined by LSA-C.C. arts. 2520 and 2523 of the type that would give rise to an action for a reduction of price pursuant to LSA-C.C. arts. 2541-2544.
Although the parties have never referred to this as an action in redhibition or quanti minoris, if those concepts do apply Mr. Harvey’s pleadings could be given that effect. American Insurance Co. v. Hartford Acc. & Indem. Co., 198 So.2d 757, 763 (La.App. 1 Cir.1967) application not considered 250 La. 735, 199 So.2d 179 (La.1967); writ refused 251 La. 26, 202 So.2d 649 (La.1967).
Mr. Harvey's claim under these articles would survive his sale to Rebsamen Industries, Inc. LSA-C.C. art. 2503; McKneely v. Don Coleman Const. Co. Inc., 441 So.2d 497 (La.App. 2 Cir.1983).
However, legal warranty against latent defects may be waived or modified. LSA-C.C. art. 2503; McKneely, supra. The question then becomes: Did the "Stock Purchase Agreement" contain language sufficient to constitute a waiver or modification?
By viewing this as an action in redhibition or quanti minoris this Court would be taking the position most favorable to Mr. Harvey.
Mr. Harvey would be entitled to the warranty against redhibitory vices unless expressly waived. Tuttle v. Lowrey Chevrolet, Inc., 424 So.2d 1258, 1260 (La.App. 3 Cir.1982).
Regardless of the fact that the parties referred to certain provisions in the agreement as warranties or representations, the legal effect of those provisions that are at issue in this litigation would be those of limitation, modification, or partial waiver of the legal warranty implicit in all sales. LSA-C.C. art. 2503.
The best explanation of the rules governing waiver of the seller's legal warranty against hidden defects contained in LSA-C.C. art. 2476 is found in Thibodeaux v. Meaux’s Auto Sales, Inc., 364 So.2d 1370, 1371 (La.App. 3 Cir.1978):
It is well established that, for a waiver of warranty to be effective, three requirements must be met;
"(1) The waiver must be written in clear and unambiguous terms;
"(2) The waiver must be contained in the sale document; and
"(3) The waiver must either be brought to the attention of the buyer or explained to him.” Hendricks v. Horseless Carriage, Inc., 332 So.2d 892 (La.App. 2nd Cir.1976).
The waiver in the instant case meets all three of these requirements: it was unquestionably contained in the sale document; it was clear and unambiguous; and it was brought to the attention of the buyer.
In Thibodeaux the plaintiff was an unsophisticated purchaser of an automobile. The court found that the waiver in question was not clear and unambiguous and was never properly explained to the plaintiff — purchaser:
The language of this purported waiver is couched in legal terms, and not in terms which may be read and understood by a layman. The requirement "clear and unambiguous" means that the language used must be comprehensible by the average buyer. The plaintiff, a woman with a sixth grade education, stated that she did not know the meaning of the words "redhibitory vices,” "redhibition,” nor was she acquainted with these legal terms or their implications.
Clearly the standards are not to be applied mechanically without reference to the peculiar facts of each case. It is obvious that what is meant by “clear and unambiguous" and "brought to the attention of the buyer or explained to him" is determined in the context of the particular transaction, a sliding scale, so to speak, taking into account the nature of the specific parties involved and practices in the marketplace. This sliding scale is implicit in virtually all cases involving the waiver of the seller’s warranty for hidden defects. The Thibodeaux court would have undoubtedly reached the opposite result had the case involved a significant commercial transaction between experienced businessmen with the benefit of professional representation, such as exists in the instant case. Where a party to a commercial transaction is represented by expert lawyers and accountants, he cannot later repudiate what they negotiated on his behalf on the ground that he did not understand certain clauses or they were not fully explained to him or called to his attention. Such a holding by this court would not only undermine the integrity of commercial transactions, it would be an open invitation to bad faith.
Therefore, even if the law were to recognize a cause of action in quanti minoris, it would deny Mr. Harvey's claim on the facts.

. In essence, all of Mr. Harvey's problems can be traced to the fact that his acquisition of Harvey Press from Dixie was with limited warranties but his sale to Rebsamen contained no such limitations. If his sale to Rebsamen had been identical to his purchase from Dixie, Mr. Harvey would not have had to pay the taxes, Rebsamen would.

. By analogy, Mr. Harvey’s contention that the "received” and "allowed” stamps are procedural only in nature and not conclusive against future review by the IRS, applies equally to the warranty found in Section 3.E stating that the tax returns have been filed and "all taxes shown thereon have been paid", i.e., it was only a warranty of procedural regularity and implicit good faith, and was never intended as a conclusive warranty against future review.